SIGNED this 16th day of August, 2013

Marcia Phillips Parsons
**UNITED STATES BANKRUPTCY JUDGE**

---

**[This opinion is not intended for publication as the precedential effect is deemed limited.]**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE

| | |
|---|---|
| In re | |
| CORTLAND C. FREEMAN, | No. 11-50541 |
| Debtor. | Chapter 7 |
| MARK VICARS, | |
| Plaintiff, | |
| vs. | Adv. Pro. No. 11-5028 |
| CORTLAND C. FREEMAN, | |
| Defendant. | |

## M E M O R A N D U M

APPEARANCES:

Mary Foil Russell, Esq.           Everett H. Mechem, Esq.
Post Office Box 274               220 Broad Street, Suite 206
Bristol, Tennessee 37621         Kingsport, Tennessee 37660
*Attorney for Plaintiff*          *Attorney for Defendant*

**Marcia Phillips Parsons, Chief United States Bankruptcy Judge.** In this adversary proceeding, the plaintiff Mark Vicars, both individually and on behalf of Kingsport Fasteners, Inc., seeks a determination of nondischargeability pursuant to 11 U.S.C. § 523(a)(2)(A), (4), and (6) against the debtor Cortland C. Freeman. The Plaintiff asserts that the Debtor fraudulently obtained from him investments in Kingsport Fasteners and that the Debtor thereafter diverted, or allowed the diversion of, assets from the corporation to its detriment and to the Plaintiff's. For the reasons discussed hereafter, the court finds in favor of the Debtor. This is a core proceeding. *See* 28 U.S.C. § 157(b)(2)(I).

I.

On March 4, 2011, the Debtor filed a voluntary petition for bankruptcy relief under chapter 7. The Plaintiff responded to the bankruptcy filing by timely commencing this adversary proceeding on June 6, 2011. In the Debtor's answer, he denied any liability and all bases for nondischargeability. On March 13 and 14, 2013, a trial was held on all issues. Testifying were the Plaintiff; the Debtor; the Debtor's father, Jimmie C. Freeman; Ethan Ralph, a former employee of Kingsport Fasteners and a current employee of the Plaintiff; and Marlene C. Quillen, an independent CPA who performed certain accounting work on behalf of Kingsport Fasteners and filed its federal income tax returns. The following constitute the court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.

In 1984, Jimmie Freeman and another individual formed a partnership known as Kingsport Fasteners, a business engaged in the retail sale of industrial supplies, tools, and fasteners in Kingsport, Tennessee. Upon the Debtor's graduation from high school in the 1980's he went to work in his father's business, and some time later the father's partner left. Thereafter, the senior Mr. Freeman and the Debtor operated Kingsport Fasteners as a partnership for a number of years. The Debtor was primarily responsible for outside sales and deliveries, while his father primarily ran the business' physical location and took care of the finances.

In November 2007, when Kingsport Fasteners was experiencing financial difficulties, the Debtor approached the Plaintiff, the owner of a local construction company and a customer of Kingsport Fasteners, about investing in the partnership. The Debtor advised the Plaintiff that the

2

company was experiencing financial difficulties, and that it did not have the necessary funds to purchase needed inventory or pay its operating expenses. The Debtor also informed the Plaintiff that he would like for his father to be able to retire from the business.

After several meetings involving the Debtor, his father, and the Plaintiff, the parties reached an agreement for the Plaintiff to join the business. Under the parties' verbal agreement, the partnership between the Debtor and his father would be dissolved, with the Plaintiff to purchase the father's interest in the business for $20,000. The Debtor and the Plaintiff would then form a corporation to own the business, with the Debtor holding a 51 percent interest in the new entity and the Plaintiff a 49 percent interest. In furtherance of this agreement, the Debtor and the Plaintiff, as incorporators, signed on April 17, 2008, a corporate charter for Kingsport Fasteners, Inc., which was filed with the Tennessee Secretary of State on April 21, 2008. The Debtor was designated as president, the Plaintiff as vice-president, and the senior Mr. Freeman as secretary and treasurer. In July 2008, a corporate checking account was opened for Kingsport Fasteners, Inc. at First Bank & Trust Company, with the Debtor and his father as the signatories.

For the most part, the day-to-day business operations of Kingsport Fasteners did not change significantly after the Plaintiff became involved. He did not take an active role in the management of the company, although he did drop by from time to time, usually in the evenings. The Debtor continued to work outside sales, and the Debtor's father continued to manage the finances and the business location, although a new employee, Ethan Ralph, was brought on to learn the business from the Debtor's father in anticipation of his eventual retirement. The Plaintiff did inject cash into the company, initially loaning the business almost $6,000 for drill bits, and then another $2,600 for diamond blades. Also at some point in 2008, First Bank & Trust made a $30,000 line of credit loan to Kingsport Fasteners that was personally guaranteed by the Plaintiff, the Debtor, and the senior Mr. Freeman. According to the Debtor, the bank had refused the company's request for a larger $60,000 limit, the sum needed to fully stock the business.

Both the Debtor and his father testified that the Plaintiff invested approximately $26,000 in the business. The Plaintiff testified that he invested various cash sums totaling approximately $30,000, often in response to request for funds from the Debtor. There was also evidence that the

Plaintiff for a period of time directly paid Ethan Ralph's salary and health insurance, but it was unclear whether these amounts were included in the $30,000 figure given by the Plaintiff.  It was also unclear whether the funds contributed by the Plaintiff were capital contributions or loans.  None of the Plaintiff's various cash contributions to the business were documented in any fashion, although the corporation's 2011 federal income tax return indicates that there was an original loan from the Plaintiff in the amount of $9,000, with the business repaying $3,000 of this amount.  In addition to the cash contributions directly to the business, on March 10, 2011, after the Debtor's bankruptcy filing, the Plaintiff paid the $26,471 balance owing on the First Bank & Trust line of credit.

It was undisputed that the Plaintiff never paid the senior Mr. Freeman the agreed $20,000 for his interest in the business. The Plaintiff testified that he had no time table in which to pay the $20,000, and that he anticipated that the corporation would pay the debt when it began making a profit.  In contrast, both the Debtor and his father testified that the $20,000 was a personal obligation of the Plaintiff, rather than a debt of the business.  The Debtor testified that the Plaintiff was to pay his father when he had the available funds. The senior Mr. Freeman testified that the Plaintiff was to pay him the $20,000 in $5,000 installments, and that he had asked him about the installments on a couple of occasions but the Plaintiff had brushed him off, stating that they would talk about it later.

It was also undisputed that after the Plaintiff's initial cash investments and the company's receipt of the line of credit, that business improved for a period of time, due in part to Kingsport Fasteners' ability to purchase and stock new inventory for resale.  At some point the parties discussed the business moving to a larger location in order to go after a larger contract with Eastman Chemical.  In furtherance of this goal, the Plaintiff purchased and renovated a building at 402 East Main Street in Kingsport at a cost that he estimated at $100,000.  Kingsport Fasteners moved into a  portion of the building and orally agreed to pay rent of $1,100 per month.  The Plaintiff testified that the business also agreed to pay real property taxes and insurance for  the premises.

By early 2010 Kingsport Fasteners was again experiencing financial problems.  The company lost Eastman's business in January 2010 because it did not have enough inventory, and several other major customers in the area either moved or filed bankruptcy, due to the collapse of

4

the building industry from the recession.

During this same time frame, the Debtor's father hired an attorney to remedy the deficiencies in Kingsport Fasteners, Inc.'s corporate formation.  Since the corporate charter was filed in 2008, no corporate bylaws had been executed, stock had not been issued, and no board meetings had been held.  Moreover, in August 2009 the corporation had been administratively dissolved.  In February 2010 Kingsport Fasteners began having monthly board meetings.  The minutes from these meetings indicate that the Plaintiff was notified of the meetings but did not attend.  Additionally, efforts were undertaken to file past due tax returns.  In February and March 2010, respectively, Ms. Quillen filed a partnership return for the Debtor and his father for the first five months of 2008, and a corporate return for Kingsport Fasteners for the latter part of 2008.  On March 23, 2010, the Tennessee Secretary of State reinstated the company's corporate status.  The attorney hired by the senior Mr. Freeman drafted corporate bylaws, a Stock Subscription and Shareholders' Agreement, and a contract setting forth the agreement between the Plaintiff and Mr. Freeman for the sale of the latter's interest in the business.  At some point a request was made to the Plaintiff that he sign the documents, but he refused to do so.

The Debtor testified that he was ill in March and April 2010 (the nature or seriousness of the illness was not specified) and that his mother or wife had to drive him around during this time to service the business' clients.  This illness was confirmed by the minutes from the March 10, 2010 board meeting which state that the Debtor was unable to make any further decisions concerning the operations of Kingsport Fasteners due to his illness, and that he was giving his father a power of attorney.  Subsequent minutes do not reflect when this power of attorney was revoked or when the Debtor's illness ended.  In April 2010, the Debtor began working part-time for his mother-in-law's business, G&C Industrial Supply, in addition to his responsibilities for Kingsport Fasteners.  The Debtor denied that his mother-in-law's company competed with Kingsport Fasteners, stating that it sold things that Kingsport Fasteners did not offer, although they did share some of the same customers.  For a period of time prior to this, the Debtor's mother-in-law had worked part-time for Kingsport Fasteners, performing clerical work.

According to the Plaintiff, he learned some time in 2010 that Kingsport Fasteners was

5

paying what he considered to be personal expenses of the Debtor and his father, including the Debtor's home mortgage, payments on the trucks they drove, various credit card debts, and mobile phone service for them and other family members.  The Plaintiff asked them to stop these expenditures but they refused, stating that the expenditures were legitimate business expenses.  The Plaintiff also testified that he repeatedly asked in 2010 to see the company's books and records, but that he was denied access, a charge that the Debtor and his father disputed, noting that the records were located on the business premises, or in the possession of the accountant, Ms. Quillen.  By June 2010, the Plaintiff was accusing the Debtor and his father of embezzling from the business.  In August 2010, the Plaintiff sent a Notice To Quit Premises, addressed to the Debtor and the senior Mr. Freeman rather than to the business, directing them to immediately vacate the business premises due to their failure as of August 1, 2010, to pay past-due rent of $11,000.  The Debtor and his father never received the Notice, as Plaintiff's attorney mailed it to the business' old address.  In fact, the Debtor and his father did not learn of the Notice until it was shown to them at trial.

Notwithstanding the eviction notice and Plaintiff's embezzlement claim, it does not appear that Plaintiff took any further action at that time to evict the business or to remove the Freemans from the business.  Kingsport Fasteners continued to be run by the Freemans and continued operations at Plaintiff's location, albeit with diminished inventory and business, throughout the rest of 2010.  Nonetheless, on October 29, 2010, the Plaintiff, both personally and on behalf of Kingsport Fasteners, sued the Debtor and his father in the Circuit Court for Sullivan County, Tennessee, alleging fraud and embezzlement.[1]  Subsequently, on December 31, 2010, the Plaintiff changed the locks at the Kingsport Fasteners' business location, thereby denying the Debtor and his father access to the business.  The Plaintiff then boxed up the business' inventory, and it remains in the building in his possession, potentially subject to an IRS lien.

The Plaintiff's state court action was stayed by the Debtor's bankruptcy filing.  In the complaint initiating this adversary proceeding, the Plaintiff states that he is bringing this action in his individual capacity and as a shareholder's derivative action on behalf of Kingsport Fasteners,

---

[1] No copy of the complaint or other documents filed in the state court action were tendered into evidence.

Inc. pursuant to Tenn. Code Ann. § 48-17-401.[2]  With respect to the former, the Plaintiff asserts in the complaint that the Debtor made fraudulent misrepresentations of fact in order to induce him to invest in the business.  Specifically, the Plaintiff alleges that the Debtor represented that the invested funds would be used by the corporation, when in fact the Debtor diverted them to his own personal use, that the Plaintiff justifiably relied upon these misrepresentations, and his reliance resulted in damage, such that Debtor's liability to the Plaintiff for that damage is excepted from discharge under 11 U.S.C. § 523(a)(2)(A) for false representations, false pretenses, or fraud.  Additionally, the Plaintiff claims that the Debtor violated his fiduciary duty to him and to Kingsport Fasteners by diverting corporate assets for personal use, such that the debt is nondischargeable under § 523(a)(4) of the Bankruptcy Code for embezzlement, larceny, or fraud or defalcation while acting in a fiduciary capacity.  Based on these same facts, the Plaintiff also alleges that the Debtor's actions constitute willful and malicious injury to the Plaintiff or his property, with the resulting damages excepted from discharge under § 523(a)(6).  Lastly, the Plaintiff asserts generally that discharge of the obligations owed to him should be denied because the Debtor filed for bankruptcy relief in bad faith.  In his complaint, the Plaintiff requested that the court determine the amount of debt owed by the Debtor to him and render judgment in his favor.  However, in his trial brief and at trial, the Plaintiff stated that he sought only a determination of nondischargeability, as he will have the amount of debt determined in the pending state court action.

At the trial's conclusion, Plaintiff's counsel advised the court in closing argument that Plaintiff's individual claim against the Debtor was based solely on unpaid rent of $22,500 for the leased premises.  As to the Debtor's alleged liability to Kingsport Fasteners, Plaintiff's counsel asserted that the Debtor was liable for the funds that he and/or his father improperly received from

---

[2]  This statute provides in part that "[a] complaint in a proceeding brought in the right of a corporation must be verified and allege with particularity the demand made, if any, to obtain action by the board of directors and either that the demand was refused or ignored or why the person did not make the demand."  Tenn. Code Ann. § 48-17-401(b).  Federal Rule of Civil Procedure 23.1(b), as incorporated by Federal Rule of Bankruptcy Procedure 7023.1, contains similar verification and demand requirements.  The Debtor has not challenged the Plaintiff's authority to bring a derivative action on behalf of Kingsport Fasteners, although the complaint in this case was not signed by the Plaintiff, and there is no allegation in the complaint that demand was refused or ignored, or why demand was not made.

the corporation or the corporation paid on their behalf, sums totaling $102,676.27, and that this amount is nondischargeable under § 523(a)(4). Each of the bases for relief asserted in the complaint or at trial will be addressed below.

II.

### A. Nondischargeability Under 11 U.S.C. § 523(a)(2)(A)

The Plaintiff's first cited basis for a determination of nondischargeability is § 523(a)(2)(A) of the Bankruptcy Code, which excepts from discharge any debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by . . . false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." 11 U.S.C. § 523(a)(2)(A). The Sixth Circuit Court of Appeals has held that in order for a debt to be nondischargeable under § 523(a)(2)(A), "a creditor must prove the following elements: (1) the debtor obtained money through a material misrepresentation that, at the time, the debtor knew was false or made with gross recklessness as to its truth; (2) the debtor intended to deceive the creditor; (3) the creditor justifiably relied on the false representation; and (4) its reliance was the proximate cause of loss." *Rembert v. AT&T Universal Card Servs., Inc. (In re Rembert)*, 141 F.3d 277, 280-81 (6th Cir.1998) (footnote omitted). The plaintiff has the burden of proof which must be met by a preponderance of the evidence. *See Grogan v. Garner*, 498 U.S. 279, 286, 111 S. Ct. 654 (1991). Moreover, "exceptions to discharge are to be strictly construed against the creditor." *In re Rembert*, 141 F.3d at 281 (citing *Mfr.'s Hanover Trust v. Ward (In re Ward)*, 857 F.2d 1082, 1083 (6th Cir.1988)).

In the case at hand, the Plaintiff asserts that the Debtor is liable to him personally for the funds that the Plaintiff invested in Kingsport Fasteners and for unpaid rent owed by the business. Before addressing the elements of § 523(a)(2)(A), it should first be noted that it is undisputed that the Plaintiff's funds were placed in or given to the business rather than to the Debtor. Similarly, it is undisputed that Kingsport Fasteners rather than the Debtor entered into the oral lease with the Plaintiff for the company's business location. There was no suggestion that the Debtor personally guaranteed the corporation's obligations to the Plaintiff, and the Plaintiff has made no attempt to pierce the corporation's corporate veil. In fact, the Plaintiff was adamant throughout this litigation

8

that Kingsport Fasteners was a corporation, an issue that the Debtor reluctantly conceded at trial.[3] Thus, it can not be said, in the literal language of the statute, that the Debtor "obtained money, property [or] services" from the Plaintiff as stated in § 523(a)(2)(A).

Nonetheless, the Sixth Circuit Court of Appeals has rejected the proposition that "a debt is nondischargeable under section 523(a)(2)(A) only when the creditor proves that the debtor directly and personally received every dollar lost by the creditor." *Brady v. McAllister (In re Brady)*, 101 F.3d 1165, 1172 (6th Cir. 1996).  Under the "benefits theory" of § 523(a)(2)(A) liability, a debtor may be liable even when he has only indirectly obtained some tangible or intangible financial benefit as a result of his misrepresentation.  *See Ash v. Hahn (In re Hahn)*, No. 11-3146, 2012 WL 392867, at *4 (Bankr. N.D. Ohio Feb. 6, 2012) (citing *Brady)*.  Thus, as found in *Brady*, a debtor who fraudulently induces a loan to a corporation that he controls may be liable for purposes of § 523(a)(2)(A).  *In re Brady*, 101 F.3d at 1172 (discussing *Ashley v. Church (In re Ashley)*, 903 F.2d 599, 604 (9th Cir. 1990)).  Therefore, the Plaintiff's claim that the Debtor fraudulently induced him into entering into a lease with, and advancing funds to, Kingsport Fasteners, a corporation for whom the Debtor was the president and majority stockholder, provides a sufficient potential basis for the

---

[3] Throughout the course of this litigation, the attorneys for the parties vigorously disputed whether a corporation was formed.  Surprisingly, it was the Plaintiff who insisted that a corporation had been formed, while the Debtor – or at least his counsel – denied the corporation's existence.  Notwithstanding this dispute between counsel, the evidence overwhelmingly demonstrated that the parties intended to form and operate via a corporation and that they took numerous steps to effectuate this intent, including the filing of a corporate charter.  As a legal matter, the filing of a corporate charter provides conclusive proof of corporate formation.  *See* Tenn. Code Ann. § 48-12-103(a)-(b).  The failure to execute bylaws or take other actions to complete the organization of a corporation is irrelevant in this context.  *See*  Tenn. Code Ann. § 48-12-105(d).

In closing argument, counsel for the Plaintiff did reference a veil piercing argument despite Plaintiff's insistence throughout this litigation that a viable and legitimate corporation had been established.  No evidence was presented, however, that the Plaintiff is entitled to this form of equitable relief.  *See Schlater v. Haynie*, 833 S.W.2d 919, 925 (Tenn. App. 1991) (stating that the corporate veil will be pierced "where the corporation is created or used for an improper purpose, or where the corporate form has been abused, as when used to an end subversive of the corporation's policy"); *Oceanics Sch., Inc. v. Barbour*, 112 S.W.3d 135, 140 (Tenn. App. 2003) (citing *Schlater*, 833 S.W.2d at 925) (party attempting to pierce the corporate veil has the burden); *CAO Holdings, Inc. v. Trost*, 333 S.W.3d 73, 89 n.13 (Tenn. 2010) (presenting various factors for consideration in veil piercing context).

Debtor's personal liability and a § 523(a)(2)(A) determination.

Turning then to the merits of the Plaintiff's claims, the court takes up first the assertion that the Debtor fraudulently induced him to enter into the lease with Kingsport Fasteners. Despite this assertion, there was no evidence of any false representation made by the Debtor in connection with the lease. The only testimony as to the lease was that offered by Plaintiff who stated that the parties discussed the desire for a larger, cleaner space to go after Eastman's business; the Plaintiff found the building and renovated it; the Debtor brought representatives from Eastman to tour the site; and the monthly lease payment was $1,100 plus insurance and taxes. There was no suggestion that the Debtor made any misrepresentations regarding the lease. While the Plaintiff was adamant generally that he had been defrauded by the Debtor, no evidence supported this assertion as it pertained to the lease. The mere fact that Kingsport Fasteners failed to pay the agreed upon rent does not establish fraud in the inception. *See Family Home Construction v. Meador (In re Meador)*, 352 B.R. 832, 838 (Bankr. E.D. Tenn. 2006) (quoting *EDM Mach. Sales, Inc., v. Harrison (In re Harrison)*, 301 B.R. 849, 854 (Bankr. N.D. Ohio 2003) ("[A] broken promise to repay a debt, without more, will not sustain a cause of action under § 523(a)(2)(A). Instead, central to the concept of fraud is the existence of scienter which, for the purposes of § 523(a)(2)(A), requires that it be shown that at the time the debt was incurred, there existed no intent on the part of the debtor to repay the obligation.")). Accordingly, the Plaintiff's claim that the Debtor is liable for the unpaid rent and that this liability is excepted under § 523(a)(2)(A) from discharge must be rejected.

The court turns next to the Plaintiff's contention that the Debtor fraudulently induced him to invest in Kingsport Fasteners. According to the complaint, the Debtor falsely represented that "the investment, capital and loans put into the Corporation by the Plaintiff were for the use and benefit of the Corporation, when in fact Debtor intentionally misused said funds, diverting them to his own personal benefit." More specifically, in his trial brief, the Plaintiff states that the "Debtor made representations to the Plaintiff concerning funds that were needed for the business. While the Debtor represented that Plaintiff's money was being used for corporate expenses, the Debtor knew that much of the funding that Plaintiff was providing was going, not for the designated purposes, but to pay Debtor's personal expenses and those of others in his family."

10

The deficiency in Plaintiff's general argument is that it was not supported at trial with concrete evidence.  There was no evidence that the Debtor ever came to the Plaintiff and asked for funds for a designated purpose and then used those funds for a different purpose.  The Plaintiff testified that he advanced funds initially for the purchase of drill bits and diamond blades and to pay the business' rent and its electricity bill, but there was no evidence that the Debtor or Kingsport Fasteners did not use the funds advanced for these purposes.  There was also testimony that the Debtor would come to the Plaintiff from time to time and state that funds were needed to purchase inventory, and the Plaintiff would give him cash for the proposed purchases.  Again, however, there was no evidence that the Debtor and/or Kingsport Fasteners did not use the funds given by the Plaintiff to purchase inventory as represented.  To the contrary, the Plaintiff's own testimony was that the funds he provided enabled Kingsport Fasteners to become current with suppliers and restock required inventory.  Admittedly, it was undisputed that by 2010 inventory levels at the business were declining, but it is not clear if the Plaintiff was still advancing funds to the business at that point, as there was absolutely no evidence as to the dates that the Plaintiff contributed funds to the business.  It was also true, as discussed hereafter, that Kingsport Fasteners, out of its general checking account, paid certain expenses on behalf of the Debtor and his father that appeared on their face to be questionable.  However, regardless of the legitimacy of these expenditures, which will be discussed hereafter, there was no evidence that any funds advanced by the Plaintiff were directly used for these purposes, or that the Debtor made any misrepresentation to the Plaintiff in order to obtain funds to make these expenditures.   In summary, because the Plaintiff has failed to carry his burden of establishing a false representation, the first element for a determination of nondischargeability under § 523(a)(2)(A), his claim under this provision must be denied.

**B.  Nondischargeability Under 11 U.S.C. § 523(a)(4)**

The court turns next to the Plaintiff's nondischargeability claim under § 523(a)(4) of the Bankruptcy Code.   Under this provision, excepted from discharge is any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny."  11 U.S.C. § 523(a)(4). The Plaintiff contends that the Debtor's actions constituted "fraud or defalcation while acting in a fiduciary capacity" or embezzlement.

11

Fraud or defalcation while acting in a fiduciary capacity. The Sixth Circuit has advised that in order to be "acting in a fiduciary capacity" within the meaning of this statute, the following must be established by a preponderance of the evidence: "(1) a preexisting fiduciary relationship; (2) breach of that fiduciary relationship; and (3) a resulting loss." *Bd. of Trs. of the Ohio Carpenters' Pension Fund v. Bucci (In re Bucci)*, 493 F.3d 635, 639 (6th Cir. 2007) (quoting *Commonwealth Land Title Co. v. Blaszak (In re Blaszak)*, 397 F.3d 386, 390 (6th Cir. 2005)).  Moreover, the court employs a narrow interpretation of the term "fiduciary," limiting it to "an express or technical trust relationship arising from placement of a specific res in the hands of the debtor." *R.E. Am., Inc. v. Garver (In re Garver)*, 116 F.3d 176, 180 (6th Cir. 1997); *see also In re Blaszak*, 397 F.3d. at 391 (§ 523(a)(4) does not apply to constructive trusts that courts may impose as an equitable remedy). What constitutes an express or technical trust is generally governed by state law. *Rowland v. Walls (In re Walls)*, 375 B.R. 399, 405 (Bankr. S.D. Ohio 2007) (citations omitted).

In the present case, the Plaintiff alleges that the Debtor breached various fiduciary duties he owed to Kingsport Fasteners and its shareholders, including the duty of good faith, duty of care, and duty to act in the best interests of the corporation, by diverting corporate assets to himself and his father. The Plaintiff acknowledges in his trial brief that § 523(a)(4) requires an express or technical trust, and asserts generally that the funds the Debtor obtained from him on behalf of Kingsport Fasteners were held in an express or technical trust.

Under Tennessee law, "[t]he directors and officers of a corporation owe a fiduciary duty to the corporation and to its shareholders." *Sanford v. Waugh & Co., Inc.*, 328 S.W.3d 836, 843 (Tenn. 2010) (citations omitted).  Similarly, "[c]ontrolling shareholders likewise owe a fiduciary duty to minority shareholders." *McRedmond v. Marianelli*, 46 S.W.3d 730, 738 (Tenn. App. 2000) (citing *Nelms v. Weaver*, 681 S.W.2d 547, 549 (Tenn. 1984)).  Tennessee courts have noted that "[a] fiduciary is a person holding the character of a trustee who bears the duty to act primarily for the benefit of another." *Sanford*, 328 S.W.3d at 843 (citing *McRedmond*, 46 S.W.3d at 738).  The duties of corporate directors and officers have been codified to state that they must exercise their duties: "(1) In good faith; (2) With the care an ordinarily prudent person in a like position would exercise under similar circumstances; and (3) In a manner the director [or officer] reasonably believes to be in the best interests of the corporation."  Tenn. Code Ann. §§ 48-18-301, 48-18-403.

Based on the foregoing, it is well settled under Tennessee law that the Debtor, as the president and majority shareholder of Kingsport Fasteners, owed the corporation and the Plaintiff, a minority shareholder, a fiduciary duty. However, as previously stated, a mere fiduciary relationship under state law is insufficient for purposes of § 523(a)(4); there must also be an express or technical trust arising from placement of a specific res in the hands of the debtor. *In re Garver*, 116 F.3d at 180. To create an express trust under Tennessee law:

> "At a minimum, there must be a grantor or settlor who intends to create a trust; a corpus (the subject property); a trustee; and a beneficiary. The trustee holds legal title in that sense, owns the property, holding it for the benefit of the beneficiary who owns the equitable title. While the grantor may retain either of these interests, no one may solely hold both as the purpose separating the two would be defeated." *Myers v. Myers*, 891 S.W.2d 216, 218 (Tenn. Ct. App. 1994). Similarly, technical trusts are defined as "'obligations arising out of a confidence reposed in a person to whom the legal title of property is conveyed, that he will faithfully apply the property according to the wishes of the creator of the trust,'" *Knox County v. Fourth & First Nat'l Bank*, 181 Tenn. 569, 182 S.W.2d 980, 984 (1944) (quoting *Jackson v. Dobbs*, 154 Tenn. 602, 290 S.W. 402, 405 (1926)), and "are created by an agreement between the parties to impose a trust relationship but may also be created by a statute that specifically imposes fiduciary obligations on a party." *Smallwood v. Howell (In re Howell)*, 178 B.R. 730, 732 (Bankr. W.D. Tenn.1995).

*Tenn. Educ. Lottery Corp. v. Cooper (In re Cooper)*, 430 B.R. 480, 495 (Bankr. E.D. Tenn. 2010).

Applying these trust principles to the present case, there is no evidence of an express trust: there is no trust corpus, trustee, or beneficiary. Similarly, there is no evidence of a technical trust. There was no agreement between the Plaintiff and the Debtor to impose a trust relationship, either with respect to the monies that the Plaintiff invested in the corporation, or with respect to the corporation's general funds. Although Tennessee law does impose specific fiduciary relationships on the Debtor as an officer and majority stockholder of Kingsport Fasteners, there is no authority under Tennessee law for the proposition that general corporate assets are held in either an express or technical trust. Courts from other jurisdictions considering similar state laws have reached the same conclusion. *See Castle Nursing Home v. Sullivan (In re Sullivan)*, 19 Fed. App'x 180, 181 (6th Cir. 2001) (applying Ohio law, the court held that the fiduciary obligations of corporate officers or controlling shareholders are insufficient to establish the existence of an express or technical trust for purposes of § 523(a)(4)); *Frost & Co., Inc. v. Smithey (In re Smithey)*, 474 B.R. 830, 843 (Bankr.

N.D. Ohio 2012) (court held that there was no authority for the proposition that a corporate officer or director, on account of their fiduciary role, hold corporate assets in an express or implied trust with a defined trust res); *Mich. Web Press, Inc. v. Wilcox (In re Wilcox)*, 310 B.R. 689, 696-97 (Bankr. E.D. Mich. 2004) ("Although Michigan law imposes a fiduciary duty of good faith on corporate officers, Michigan law does not provide that corporate assets are placed in trust with corporate officers or that corporate officers act as trustees. Thus a corporate director or officer is not a fiduciary under section 523(a)(4).") (citations omitted)); *see also In re Blaszak*, 397 F.3d. at 391 ("§ 523(a)(4) applie[s] to trustees who misappropriate funds held in trust, and not to those who fail to meet an obligation under a common law fiduciary relationship").  Accordingly, the Plaintiff's claim that any obligation owed by the Debtor to him or to the corporation is nondischargeable under § 523(a)(4) as a fraud or defalcation by a fiduciary must be rejected as a matter of law.

Embezzlement.  The court turns next to the Plaintiff's claim that the Debtor's alleged diversion of corporate assets from Kingsport Fasteners constituted embezzlement under § 523(a)(4). For purposes of this provision, embezzlement is "the fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come." *In re Brady*, 101 F.3d at 1172-73 (quoting *Gribble v. Carlton (In re Carlton)*, 26 B.R. 202, 205 (Bankr. M.D. Tenn. 1982)).  "A creditor proves embezzlement by showing that he entrusted his property to the debtor, the debtor appropriated the property for a use other than that for which it was entrusted, and the circumstances indicate fraud." *Id.* at 1173.  Furthermore, "[b]oth the intent and the actual misappropriation necessary to prove embezzlement may be shown by circumstantial evidence." *WebMD Practice Servs., Inc. v. Sedlacek (In re Sedlacek)*, 327 B.R. 872, 880 (Bankr. E.D. Tenn. 2005) (quoting *Goodmar, Inc. v. Hamilton (In re Hamilton)*, 306 B.R. 575, 582 (Bankr. W.D. Ky. 2004)).  Each embezzlement element must be proven by a preponderance of the evidence.  *See Grogan*, 498 U.S. at 291.

The Plaintiff devoted the majority of the evidence he tendered in this case toward the contention that the Debtor misappropriated corporate funds for personal use.  Similarly, the majority of the testimony given by the Debtor and his father concerned the legitimacy of various expenditures by Kingsport Fasteners.  In this regard, the Plaintiff tendered Kingsport Fasteners' canceled checks from July 2008 through October 2010.  According to Plaintiff's counsel in closing argument, these

14

checks reflect that Kingsport Fasteners improperly paid out a total of $102,676.27 on behalf of the Debtor and his father. The court will examine by category the different expenditures made by Kingsport Fasteners, Inc. that the Plaintiff alleges are improper.

*Mortgage Payments*. The evidence indicated that Kingsport Fasteners often paid the Debtor's monthly first and second mortgage payments, totaling $800.58 per month to CIC Consumer Services, with expenditures from July 2008 through 2009 totaling $9,645.83. In explanation, both the Debtor and his father testified that a second mortgage had been placed on the Debtor's personal residence when he borrowed $50,000 on behalf of the business in 2002. According to the Freemans, the $800.58 payment included $358.58 for the Debtor's first mortgage; Kingsport Fasteners would directly pay both mortgages, and the Debtor would then reimburse the company for the first mortgage amount. Both the Debtor and his father testified that this procedure had been followed since the Debtor obtained the loan in 2002, and noted that the mortgage debt was included on Kingsport Fasteners' 2007 Statement of Financial Condition as part of its accounts payable. Similarly, the $50,000 amount was documented as a loan from the Debtor to the company on Form 1120 of its tax returns. Marlene Quillen testified that upon Kingsport Fasteners' incorporation, all of the assets and liabilities of the partnership between the Debtor and his father, including the mortgage debt, was transferred to the corporation.

The Plaintiff argues that Kingsport Fasteners' payment of the Debtor's personal mortgage was an embezzlement by him. The Plaintiff testified that he had no knowledge of the mortgage indebtedness when he invested in the business, and that it should have been disclosed. Despite these arguments, the court is unable to conclude that the mortgage payments were misappropriations by the Debtor rather than legitimate business expenses of the company. Granted, the transaction should have been properly documented as a loan from the Debtor to Kingsport Fasteners and evidenced by a promissory note, such that the company repaid the Debtor rather than the mortgage company directly. Additionally, the business should not have been paying the Debtor's first mortgage, even though the Debtor reimbursed the business for these payments. However, these improper accounting practices did not render the business' payments of the Debtor's mortgage obligations fraudulent or an embezzlement, as there was no evidence that the corporation suffered any financial loss. Despite the lack of a promissory note from Kingsport Fasteners to the Debtor, the evidence otherwise

established that the Debtor loaned the business $50,000 that he had borrowed.  Similarly, there was no evidence contradicting the Freemans' testimonies that the Debtor repaid the business for his first mortgage payments that the corporation paid on his behalf.  Although the court is sympathetic to the Plaintiff's complaint that the loan indebtedness should have been disclosed, there was no indication that the Debtor and/or his father intentionally hid this information from the Plaintiff; they testified that they had operated this way since the Debtor obtained the loan in 2002, such that the indebtedness would have been evident in the company's books and records.  Accordingly, the Plaintiff's claim that the Debtor embezzled funds from Kingsport Fasteners in order to pay his personal mortgage obligations must be rejected.

*Trucks*.  The evidence established that Kingsport Fasteners owned and paid for the trucks driven by the Debtor and his father, consistent with the company's historical practice.  According to their testimonies, they needed the trucks to make deliveries for the business on a 24-hour a day basis, and had been advised by their accountant to trade every three years to benefit the company.  With respect to the truck driven by the Debtor's father, Kingsport Fasteners paid a monthly payment of $458.94 to Toyota Financial for total payments of  $10,992.96, along with payments totaling $222.57 to Toyota of Kingsport for servicing the vehicle.  As to the truck driven by the Debtor, Kingsport Fasteners made monthly payments of $585.60 to Chrysler Financial with total payments of $12,315.78 during the 2008 to 2010 time period for a 2008 Dodge Ram 2500 truck purchased by Kingsport Fasteners on August 17, 2008, with a 2005 truck of the same model having been traded in by the business.  The Debtor testified that prior to the purchase he talked with the Plaintiff regarding the type of truck to buy, and the Plaintiff had stated that a Dodge would be okay, although he preferred another manufacturer.

The Plaintiff testified that he did not know that the business was providing the truck driven by the Debtor's father, and disputed his need for a business vehicle, although the senior Freeman testified that he also made deliveries on occasion.  The Plaintiff also questioned the Debtor's need for a 3/4 ton truck, stating that he had a large truck that the company could have used.  The Debtor responded that the Eastman contract required the use of pallets, and that the orders he delivered were heavy, necessitating the need for a truck with a greater hauling capacity and that this truck allowed him to reduce the number of deliveries.  The Debtor also testified that the Plaintiff had never offered

16

to let the business use his truck.

From the evidence, the court is unable to conclude that the fact that Kingsport Fasteners provided trucks for the Debtor and his father to drive constituted embezzlement by the Debtor.  It is not uncommon for a closely-held business to provide vehicles for its employees that make deliveries or for its upper-level management.  Moreover, it was undisputed that the Plaintiff left the day-to-day running of the business to the Debtor and his father, especially the latter, and that the Debtor had discussed the purchase of the 2008 Dodge truck with the Plaintiff.  As with respect to the Debtor's mortgage payment, Kingsport Fasteners' liability for the trucks driven by the Debtor and his father was set forth on its 2007 Financial Statement, and the company's historical practice of providing trucks for the Debtor and his father to drive would have been evident from the company's records.  While in hindsight parties may quibble regarding an employee's need for a company-provided truck, or the size of the truck provided, clearly these decisions fell within the management discretion of the Debtor and his father.  Consequently, the evidence did not establish that the Debtor fraudulently misappropriated corporate funds to purchase the trucks driven by him and his father.

*Credit card payments*.  The evidence indicated that Kingsport Fasteners wrote checks totaling $17,915.74 to Bank of America on three credit cards with account numbers ending in 3178, 9372, and 3025.  The Debtor testified that the 3178 account was his and that it was used as a business credit card for Kingsport Fasteners.  The 9372 account belonged to the Debtor's father, although it was not clear whether it was a personal or business card.  No party was able to provide clarification regarding the 3025 account, for which five payments totaling $2,065.74 were made in 2008.

In addition to the payments to Bank of America, Kingsport Fasteners also paid a total of $10,723.79 on a CitiBank credit card, $1,500 on a CitiBank Business credit card, and $3,962 on a Discover credit card.  The latter was the Debtor's personal account.  The CitiBank Business credit card belonged to the Debtor's father and according to him was used for business expenses.  He could not recall specifics about the other CitiBank credit card other than to state that the CitiBank cards were used for business expenses, including truck fuel.  Both the Debtor and his father testified that

17

Kingsport Fasteners had difficulty obtaining credit as an independent entity, necessitating on occasion the use of personal credit cards to pay business expenses.  The Debtor also testified that on occasion the company would have no funds with which to pay him so he would write himself a check on the Discover card, and then have the company pay the Discover card bill when it had the funds.   Both Freemans testified that all credit cards statements were reviewed upon receipt to determine if the charged amounts were for business or personal expenses.  If the former, Kingsport Fasteners would make direct payment to the card company.  The Debtor denied that Kingsport Fasteners had ever paid any of his personal credit card expenses.  The vast majority of the checks used to pay the credit card obligations were signed by the senior Mr. Freeman, as he acted as bookkeeper and treasurer for the corporation and generally paid most of the bills.  The CPA Marlene Quillen confirmed that in preparing the business' tax returns she required the Freemans to provide documentation that payments by the company on all personal credit cards were for legitimate business expenses, and that when the required documentation was not supplied, she treated the payments as salary advances to the individual whose name was on the card.  The court found Ms. Quillen, who had been a public accountant since 1950, to be highly credible.

As with respect to all of the evidence in this case, the court's consideration of the witness' testimonies was aided with little documentation.  Only a few of the credit card statements were introduced, and only a couple of these set forth the separate charges. The parties disputed who had the supporting documents to the checks and the credit card statements.  The Debtor and his father testified that the Plaintiff retained all of the records for the company after they were locked out, while the Plaintiff asserted that he had none of the supporting documentation for the payments. Consequently, the issue came down to credibility, and the court found the Debtor and his father, as well as Ms. Quillen, to be highly credible.  The Plaintiff argues that the court can infer misappropriation because of the evidence that Kingsport Fasteners paid some personal credit card bills.  However, because of the careful review given all expenditures by Ms. Quillen, and having found the Debtor and his father to be credible in their testimonies that only credit card obligations for legitimate business expenses were paid by the company, the court is unable to conclude that the Debtor misappropriated funds from Kingsport Fasteners by the payment of these credit card obligations.

18

*Debtor's salary.*   In closing argument, counsel for the Plaintiff argued that the evidence demonstrated that the Debtor was overpaid by $11,530 in 2008, $19,732.22 in 2009, and $5,841.40 in 2010.   The Plaintiff testified that the Debtor was to be paid $700 per week, while the Debtor's father testified that the Debtor's salary was $700 or $750 a week.   An examination of the cancelled checks written to the Debtor reveal that payments to the Debtor were often irregular in both amount and frequency, although the most common amount paid to the Debtor was $750.   According to the Debtor, Kingsport Fasteners often did not have sufficient funds on hand to pay full salaries and, consequently, would pay just part of the salary owing, making up the balance at a later date.   The Debtor and his father also testified that the Debtor was often reimbursed by check for expenses that he personally paid on behalf of the company.   The majority of checks written to the Debtor were signed by the Debtor's father.

The 2008 check summaries show that between July 25, 2008, and December 29, 2008, twenty-eight checks totaling $16,230 were written on Kingsport Fasteners' checking account to the Debtor.   Of this total, one check for $285 was labeled as a "reimbursement," leaving $15,945 presumably as salary although the checks are not labeled as such.   This time period is approximately 23 weeks, and assuming a weekly salary of $700, the Debtor should have been paid $16,100.   Thus, rather than being overpaid, the Debtor appears to have been slightly underpaid in 2008.

In 2009, there were 79 checks totaling $44,923.32 written on Kingsport Fasteners' bank account to the Debtor.   Ten of the checks totaling $2,653.32 were specifically designated as reimbursements.   Additionally, four of the checks totaling $1,581 were designated as loan repayments, with three of these checks, totaling $1,326, appearing to have been issued for the loan associated with the Debtor's previously referenced mortgage payment.   Assuming that the balance of the unidentified checks represented salary, the Debtor appears to have been paid $40,944 in salary in 2009.   At $700 per week the Debtor's annual salary for 52 weeks would have been $36,400.   If the Debtor's weekly salary was $750, his annual salary would have been $39,000.   Thus, assuming salary payments of $40,944 to the Debtor in 2009, he appears to have been overpaid by amounts ranging from $1,944 to $4,504.

As for the year 2010, the cancelled checks for January 1, 2010, through October 18, 2010,

19

indicate that the Debtor received 44 checks totaling $25,041.48 from Kingsport Fasteners, with the last payment being made on September 10, 2010. Five of the checks were specifically designated as various reimbursements for a total of $356.40. Additionally, six of the checks were designated as loan repayments for a total of $2,161, with three of these checks, totaling $1,326, appearing to have been issued for the loan associated with the Debtor's mortgage payment. Moreover, the Debtor testified that he continued to work full-time for Kingsport Fasteners until the end of 2010, during which period he was not paid a salary, although the company continued to pay his health insurance.[4] Consequently, the Debtor received approximately $23,359.08 in salary in 2010, substantially less than an annual salary of $36,400, assuming $700 per week. When the 2010 salary payments are combined with the overpayment in 2009, and the slight underpayment in 2008, it appears that the Debtor received in salary total payments of $80,248.08 ($15,945 + $40,944 + $23,359.08). In comparison, salary for the same time period – two years plus 23 weeks – at a weekly salary of $700 which the Plaintiff states the Debtor was to be paid, is $88,900. Thus, based on salary figures alone, the Debtor was underpaid by more than $8,000 during the time that the Plaintiff was involved in the business. Moreover, even if the court were to treat all checks to the Debtor during this same time frame as salary, including those identified as reimbursement and loan payments, the total paid by Kingsport Fasteners to the Debtor was $86,194.80 ($16,230 + $44,923.32 + $25,041.48), still less than the authorized salary of $88,900. Accordingly, the evidence did not establish that the Debtor overpaid himself from Kingsport Fasteners.

*Regions Bank*. Kingsport Fasteners' canceled checks show that the company wrote a total of seven checks to Regions Bank in 2008 and 2009 totaling $3,562.79, all signed by the Debtor's father. Although the same account number is listed on the checks, there was no indication as to the purpose of the payment or in whose name the account is listed. Neither the Debtor nor his father

---

[4] As previously stated, the evidence was that the Debtor began working part-time for G&C Industrial Supply in April 2010. Although there was some evidence that G&C was a similar business as Kingsport Fasteners and shared some of the same customers, the testimony was that G&C only sold items that Kingsport Fasteners did not offer for sale. The significance of this evidence within the context of § 523(a) is unclear, however, because it does not independently establish fraud for purposes of § 523(a)(2)(A) and is irrelevant within the context of § 523(a)(4) and (6).

had any definite recollection as to the payments.  The senior Mr. Freeman testified that the payments may have been the balance owing on the truck previously driven by the Debtor, but that supposition is inconsistent with the fact that the company purchased the new truck in August 2008, and payments to Regions continued in 2009.  The Debtor testified that the Regions payments may have been payments on a camper personally owned by him, but used by the company's business customers.  The Debtor testified that he may have brought this bill to his father for payment because he did not always receive his full salary.  The court's review of the claims register in this case reveals that Regions Bank is the secured creditor with respect to a camper owned individually by the Debtor, which camper was surrendered in the bankruptcy case, but the account number is a different number than the account number referenced on the checks written by Kingsport Fasteners to Regions Bank.  Based on the absence of any evidence that the Debtor benefitted from the corporation's payments to Regions Bank or that he authorized the payments, the court is unable to conclude that the payments by Kingsport Fasteners to Regions Bank were fraudulent misappropriations by the Debtor.

*Internet and Telephone Service*s.  From the evidence, it appears that Kingsport Fasteners paid for the Debtor's home internet service, at a total cost from 2008 to 2010 of $1,164.08, and paid for the entire cost of the Debtor's Verizon family cell phone plan, with payments totaling $6,859.42 for the same period.  Included on the family cell phone plan with the Debtor was his father, his mother, his wife, and his daughter.  Counsel for the Plaintiff argued that only one-third, or $2,286.47, of the $6,859.42 paid to Verizon represented a legitimate business expense, such that the balance constituted an embezzlement by the Debtor.

In response, both the Debtor and his father testified that the Debtor often worked from home in the evenings, necessitating access to the internet since Eastman often required orders around the clock and posted the orders on its website.  Similarly, the Debtor and his father testified that they needed cellular telephones, since the Debtor was often traveling during the day making deliveries.  The senior Mr. Freeman testified that when the business was still operating the Plaintiff had complained about the Debtor's cell phone service being paid by the business and that as a result Mr. Freeman had investigated the potential savings that would be derived by removing other family members from the plan.  He testified that he was informed that canceling the additional lines would

21

result in early termination penalties that would exceed the cost of the continued service for the entire family.  Accordingly, the cell phone plan was not changed.  The Debtor also testified that his wife and mother on occasion assisted the business in making small deliveries.  Based on this undisputed evidence, the court does not find that these expenditures on behalf of the Debtor and his family evidenced an intent to defraud the corporation or the Plaintiff.

*Internal Revenue Service*.  Kingport Fasteners made a $2,064 payment to the United States Treasury in 2008.  Included on the check was a nine digit number, which the Debtor identified as his social security number.  The Debtor's father testified that this payment was for the Debtor's withholding taxes, which the company previously had failed to pay. This testimony was supported by other evidence that indicated that Kingsport Fasteners had failed to pay substantial withholding and payroll taxes, which at the time of trial the senior Mr. Freeman was paying personally as the responsible party.  The explanation for the failure was that in the changeover from partnership to corporation the Debtor's father had not understood that these taxes were required to be paid directly by the business.  Based on this evidence, the court is unable to conclude that Kingsport Fastener's $2,064 payment to the United States was improper, much less that it evidenced an intent to defraud by the Debtor for purposes of § 523(a)(4).

*Expenses on behalf of the Debtor's father*.  Lastly, the Plaintiff asserts that the Debtor is liable for numerous expenditures made by Kingsport Fasteners for the benefit of the Debtor's father. These expenditures include payments to: (1) Brownells, a gun parts supplier, totaling $1,536.78; (2) Cabella's, a sporting goods supplier, totaling $7,300; (3) Dr. John R. Barnes, a dentist, for $85; and (4) Erie Family Life Insurance for $70.  Regarding the Brownells and Cabella's expenditures, the senior Mr. Freeman testified that these expenses were almost exclusively for his personal benefit, with occasional Brownells purchases for customers.  Similarly, he testified that the Dr. Barnes payment resulted from his use of a Kingsport Fasteners check to pay for a dentist visit.  Lastly, the Erie Family Life Insurance payment was a payment for a life insurance policy that Mr. Freeman maintained on his granddaughter, the Debtor's daughter.  All of the checks for these expenditures were signed by the senior Mr. Freeman alone.  He testified that he had planned to repay the business upon being paid by the Plaintiff for his share of the company.

The Plaintiff asserts that the Debtor is liable for the checks that his father wrote on his own behalf because the Debtor was the company's president.  In response, both the Debtor and his father testified that the Debtor did not generally oversee his father's management of Kingsport Fasteners' finances.

Without question, these expenditures were improper, and were a misappropriation by the Debtor's father.  Nonetheless, there was no evidence that the Debtor authorized his father to make these expenditures, or that he was even aware that they were occurring.  Thus, it cannot be said that the Debtor misappropriated any funds from Kingsport Fasteners, or that the circumstances indicate fraud.  And, as an aside, although the amount of the federal payroll taxes that the senior Mr. Freeman is currently paying as the responsible party for Kingsport Fasteners was not disclosed, other than Ms. Quillen's testimony that the amount was "right much," the liability of Mr. Freeman to Kingsport Fasteners for these improper expenditures may be offset by his payments to the IRS on the company's behalf.

Before leaving the subject of nondischargeability for embezzlement under § 523(a)(4), this court notes that some courts have found that corporate officers or directors may be liable for embezzlement under § 523(a)(4) for unauthorized withdrawals of corporate funds that are used for personal purposes.  *See Netwest Commc'ns Grp., Inc. v. Mills (In re Mills)*, No. 06-06012-TLM, 2008 WL 2787252, at *5 (Bankr. D. Idaho June 25, 2008).  As an example, in corporations where an officer's salary is clearly defined by agreement and funds are taken in excess of that amount, that officer may be liable for embezzlement under § 523(a)(4).  *See id.* (citations omitted).  However, where an officer's salary or benefits are not clearly defined, embezzlement is often difficult to establish because the suspected officer may frequently have broad authority to manage the corporation's assets.  *See id.* at *5-6 (citations omitted).

Applied to the present case, it is clear that in many respects that notwithstanding the incorporation of Kingsport Fasteners, the Debtor and his father continued to operate the business as a partnership consistent with their past practices.  The company continued to pay for the Debtor's internet access, his family cellular telephone plan, and the trucks driven by him and his father.  Similarly, it appeared that the Debtor and his father sometimes used business credit cards for

23

personal expenses, and personal cards for business expenses, settling up when the bills came in. While it appears that the Debtor's father may not have always repaid what he owed the company, there was no evidence that the Debtor failed to do so, or that he authorized or was even aware of his father's actions. From all indications, the Debtor appears to have left the running of the office, along with the company's finances, up to his father. Also, as discussed previously, the Plaintiff left direct management of the business to the Debtor and his father, and there were no express or clearly defined limits on their authority to operate the business as they saw fit, including designating certain discretionary expenditures, such as trucks, home internet, and cell phones, as necessary business expenses. While in hindsight the Plaintiff finds some of their decisions objectionable, none of the expenditures, other than the personal expenses for the senior Mr. Freeman, were outside of the limits of their authority and discretion. Moreover, contrary to the Plaintiff's assertion in this regard, it was apparent to the court that the Debtor and his father attempted to the best of their abilities to save the business and that it failed, not due to their embezzlement, but because of insufficient capital and the ripple effect of the 2008 recession on the housing industry. Accordingly, the Plaintiff's claim that the Debtor is liable to him and Kingsport Fasteners for misappropriated funds from the business, and that the liability is excepted from discharge under § 523(a)(4), must be rejected.

### C.  Nondischargeability Under 11 U.S.C. § 523(a)(6)

Pursuant to § 523(a)(6), a debt is nondischargeable when it is the result of "willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). Under the express terms of the statute, "the [obligation] must be for an injury that is both willful and malicious. The absence of one creates a dischargeable debt." *Markowitz v. Campbell (In re Markowitz)*, 190 F.3d 455, 463 (6th Cir. 1999).

As to the willfulness component, the Supreme Court has explained that "nondischargeability takes a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury." *Kawaauhau v. Geiger*, 523 U.S. 57, 61, 118 S.Ct. 974 (1998). Expanding on this language, the Sixth Circuit has concluded "that unless 'the actor desires to cause the consequences of his act, or believes that the consequences are substantially certain to result from it,' he has not committed a 'willful and malicious injury' as defined under § 523(a)(6)." *In re Markowitz*, 190 F.3d at 464 (citations

24

omitted).

"'Malicious' means in conscious disregard of one's duties or without just cause or excuse; it does not require ill-will or specific intent to do harm." *Wheeler v. Laudani*, 783 F.2d 610, 615 (6th Cir. 1986) (citations omitted). Stated differently, "[t]here must also be a consciousness of wrongdoing. . . . It is this knowledge of wrongdoing, not the wrongfulness of the debtor's actions, that is the key to malicious under § 523(a)(6)." *ABF, Inc. v. Russell (In re Russell)*, 262 B.R. 449, 455 (Bankr. N.D. Ind. 2001) (citations omitted). A party may establish malice for purposes of § 523(a)(6) by showing "that (1) the debtor has committed a wrongful act, (2) the debtor undertook the act intentionally, (3) the act necessarily causes injury, and (4) there is no just cause or excuse for the action." *JP Morgan Chase Bank, NA v. Algire (In re Algire)*, 430 B.R. 817, 823 (Bankr. S.D. Ohio 2010) (citing *Vulcan Coals, Inc. v. Howard*, 946 F.2d 1226, 1228 (6th Cir. 1991); *Petralia v. Jercich (In re Jercich)*, 238 F.3d 1202 (9th Cir. 2001)).

In his complaint, the Plaintiff asserts that the debt owed to him personally by the Debtor is excepted from discharge under § 523(a)(6). The Plaintiff does not address his § 523(a)(6) claim in his trial brief, and at trial, his counsel stated that no independent evidence supporting this claim would be provided, making proof of this claim dependent on evidence offered to establish the Plaintiff's other § 523(a) claims.

Because of the Plaintiff's failure to fully develop this claim, it is difficult to determine the factual bases for any individual claim under § 523(a)(6). As previously stated, the Plaintiff's individual claims are derived from the unpaid rent and the funds that he invested in the company. Neither of these claims provide a factual context that would suggest the legal conclusion that the Debtor intentionally harmed the Plaintiff or his property, or that the Debtor believed that such harm was substantially certain to result from his actions.

To the extent that the Plaintiff is asserting a § 523(a)(6) claim on behalf of Kingsport Fasteners, the court assumes that the injury is the Debtor's alleged conversion of corporate assets. Under Tennessee law, "[c]onversion is 'the appropriation of property to the party's own use and benefit, by the exercise of dominion over it, in defiance of the plaintiff's right." *Brandt v. Bib Enters., Ltd.*, 986 S.W.2d 586, 595 (Tenn. App. 1998) (quoting *Mammoth Cave Prod. Credit Ass'n*

25

*v. Oldham*, 569 S.W.2d 833, 836 (Tenn. App. 1977)).  However, not every conversion constitutes a willful and malicious injury for purposes of § 523(a)(6). As stated by the Supreme Court:

> [A] willful and malicious injury does not follow from every act of conversion, without reference to the circumstances.  There may be a conversion which is innocent or technical, an unauthorized assumption of dominion without willfulness or malice. There may be an honest but mistaken belief, engendered by a course of dealing, that powers have been enlarged or incapacities removed.  In these and like cases, what is done is a tort, but not a willful and malicious one.

*Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 332, 55 S. Ct. 151 (1934) (citations omitted).

In the case at hand, there was no evidence that the Debtor intended to harm the Plaintiff or Kingsport Fasteners, such that the alleged conversion by him was willful.  Nor was there any evidence that the Debtor was conscious  that he was doing wrong in his management decisions, the malicious component of § 523(a)(6).  More fundamentally, as discussed with respect to the Plaintiff's embezzlement claim, the evidence does not establish that the Debtor converted the assets of Kingsport Fasteners.  Accordingly, the Plaintiff's § 523(a)(6) claim must fail.

### D.  Nondischargeability For Filing Bankruptcy Petition in Bad Faith

In the last cause of action asserted in the complaint, the Plaintiff notes that the Debtor filed for bankruptcy relief after he was sued in state court by the Plaintiff, and consequently argues that the Debtor filed bankruptcy "with the intent to hinder or delay the Plaintiff from continuing the litigation."  Based on this allegation, the Plaintiff asserts that the Debtor "is not entitled to a discharge of his debt to Plaintiff because the Debtor has brought this Petition in bad faith."  The Plaintiff cites no particular Bankruptcy Code section for this proposition, and has not otherwise moved to dismiss the Debtor's bankruptcy case for lack of good faith.  *See Indus. Ins. Servs., Inc. v. Zick (In re Zick)*, 931 F.2d 1124, 1127 (6th Cir. 1991) (recognizing that lack of good faith is a basis for dismissal of a chapter 7 case under  11 U.S.C. § 707(a)).

The Plaintiff did not address this claim in his trial brief, although his counsel generally referenced the contention in her opening statement.  To the extent that the lack of good faith can be a basis for a determination of nondischargeability, as well as for dismissal of a bankruptcy case, the court believes that the same standard should apply.  According to the Sixth Circuit, dismissal for a

26

lack of good faith should be "utilized only in those egregious cases that entail concealed or misrepresented assets and/or sources of income, and excessive and continued expenditures, lavish lifestyle, and intention to avoid a large single debt based on conduct akin to fraud, misconduct, or gross negligence." *In re Zick*, 931 F.2d at 1129.  Applied to the case at hand, there was no evidence that the Debtor concealed or misrepresented assets or sources of income, or that he had excessive and continued expenditures, and a lavish lifestyle.  The Debtor's schedules reveal that his home has a value of $111,900, and that his personal property, excluding his interest in Kingsport Fasteners, totals less than $40,000.  The Debtor's income in 2010, according to his Statement of Financial Affairs, was $54,681.93, and his net monthly income at the time of his bankruptcy filing for a family of three was $3,324.32, with monthly expenses of $3,579.02.  Similarly, other than the timing of the bankruptcy filing, there was no evidence of an intention to avoid a large single debt.  According to his schedules, the Debtor listed secured debts on his home, camper, and truck totaling $78,515.21; an unsecured priority debt to the Internal Revenue Service of $49,154.76; and unsecured nonpriority obligations totaling $58,619.38, owed to five different creditors.  The mere fact that the Debtor filed bankruptcy while the Plaintiff's state court action was pending is insufficient, in and of itself, to establish lack of good faith.  *See, e.g., In re Barajas*, No. 08-10982-B-7, 2008 WL 4153677, *2 (Bankr. E.D. Cal. Sept. 3, 2008).  Moreover, based on all of the evidence in this case, the court is otherwise unable to conclude that this is an egregious case that justifies either dismissal or a determination of nondischargeability based on lack of good faith.  Consequently, any claim for relief based on lack of good faith must be rejected.

### III.

For the foregoing reasons, an order will be entered in favor of the Debtor and denying the Plaintiff a judgment of nondischargeability.

# # #